IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**CAROLANN MARIE DOS SANTOS**

      v.                                        C.A. NO. 15-923

**WAKEFERN FOOD CORP.**

## MEMORANDUM OPINION

**SCHMEHL, J.**   /s/ JLS                                       JANUARY 31, 2017

      Plaintiff brought this action claiming she was terminated by the Defendant based on her age in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff also claimed that she was terminated in retaliation for complaining about age discrimination. After Defendant filed a motion for summary judgment, Plaintiff withdrew her age discrimination claims under the ADEA and the PHRA, leaving only the retaliation claims. (ECF 37, p.1, n.2.) For the reasons that follow, the motion for summary judgment is granted.

## STANDARD OF REVIEW

      Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its

1

existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The following facts are either undisputed or construed in a light most favorable to Plaintiff:

1. Defendant is a supermarket buying cooperative with distribution centers in New Jersey and Pennsylvania, including Breiningsville, Pennsylvania. (Brown Cert., ¶3.)

2. Defendant hired Plaintiff (age 56 at the time) on January 29, 2008 to work as a part-time Clerk on the Third Shift at the Breiningsville distribution center. (Pl. Tr., 16:17-19; 24:4-6; First Amended Complaint, ¶¶ 18-19).

3. Plaintiff's direct supervisor was Norman Gibbs ("Gibbs"), the Lead Clerk (age 51 at the time). (Pl.Tr., 26:1-4; 26:13-20; 66:8-11; Brown Cert., ¶14).

4. Plaintiff was frequently counseled by Gibbs regarding conflicts she had with her

coworkers. For example, as early as September 9, 2008, Gibbs verbally counseled Plaintiff regarding an argument she had with another employee (Alexis Gaffney) on the warehouse floor. (Gibbs Cert., ¶5 and Ex. A). On November 8, 2009, Gibbs counseled Plaintiff for causing a disruption in the warehouse with her complaints that another employee (Michelle Ritter) received the employee of the month award. (*Id.* at ¶6 and Ex. B). On February 16, 2010, Gibbs counseled Plaintiff for causing a disruption in the warehouse regarding an incident involving her daughter (Paulette Dos Santos), who also worked for Defendant. (*Id.* at ¶7 and Ex. C). Shortly thereafter, on April 1, 2010, Gibbs counseled Plaintiff regarding her inability to work with another Clerk (Marilyn Caban). (*Id.*, ¶8 and Ex. D). On January 7, 2011, Gibbs counseled Plaintiff for yelling at other Clerks who refused to help her. (*Id.* at ¶9 and Ex. E).

     5. On September 10, 2009, Gibbs issued Plaintiff a written disciplinary action because supervisor Paul Stilwell observed Plaintiff using her cell phone in the warehouse during working hours. (Pl. Tr., Pl. Tr., 61:19-21; 62:4-7; Rygiel-Boyd Cert., Ex. G).

     6. In March 2011, there was an open full-time Clerk position on the Third Shift. (Pl. Tr., 38:15-18; 38:25-39:6).

     7. In accordance with Defendant's policy to offer the most senior part time employee an open full time position, Plaintiff, who "was the next seniority in line," was promoted to the full-time Clerk position. Plaintiff was 60 years old at that time. (Pl. Tr., 38:11-20; 39:18-40:14).

     8. As a full-time Clerk, Plaintiff's job duties were similar to those she performed as a part-time Clerk, except now she also was assigned to work in the receiving or the

3

shipping office. (Pl. Tr., 72:8-21). She was not exclusively assigned to a particular office; her assignments rotated. (Pl. Tr., 72:22-74:1). Additionally, Plaintiff assisted on the warehouse floor when the business needs dictated it. (Pl. Tr., 74:5-12).

9. On August 29, 2011, five months after Plaintiff was promoted to full-time clerk on the Third Shift, Cathy Benscoter ("Benscoter")(age 48 at the time) was promoted to a Supervisor position on the Third Shift. (Benscoter Tr., 7:2-14; 16:24-17:4; 17:18-23; 32:3-5).

10. Prior to her promotion, Benscoter had worked as a full-time Clerk on the First Shift since 2005. (Benscoter Tr., 5:19-21; 17:5-9).

11. Three Supervisors were assigned to the Third Shift (Benscoter, Paul Stillwell, and Ron Foxworth), all of whom were responsible for supervising the movement of merchandise into, through and out of the warehouse. Although Benscoter (and the other Supervisors) oversaw the day-to-day work performed by the clerks (including Plaintiff), Gibbs, the Lead Clerk, was the clerks' direct supervisor. (Benscoter Tr., 19:23-20:4). Gibbs in turn reported to both the Third Shift Supervisor, Bill McNellis ("McNellis")(age 59 at the time), and the Senior Administrative Supervisor, Don Carmichael ("Carmichael")(age 49 at the time). (Pl. Tr., 52:21-53:24).

12. In her new position, Benscoter began to change certain Third Shift procedures to conform to First Shift procedures. (Benscoter Cert., ¶¶3, 9). For example, Benscoter wanted part-time clerks to come into the receiving office to check if their loads were balanced, as was done on the First Shift. (*Id.*, ¶4). Benscoter also asked the part-time clerks to use the intercom system to page the lumpers to their doors. (*Id.*, ¶5). Benscoter

4

also wanted each clerk to physically check the incoming freight to ensure there were no issues, which was not always being done by the Third Shift clerks. (*Id.*, ¶6). Benscoter also instructed Plaintiff to first call in the vendor trucks that had arrived on time for their Third Shift delivery appointment, and then call in the trucks that had arrived late for a Second Shift delivery. (Pl. Tr., 104:13-106:11; Benscoter Cert., ¶7).

       13. Plaintiff was unhappy with the new procedures Benscoter implemented because they were different from what she had been doing for five months before Benscoter's arrival. (Pl. Tr., 112:17-22; 113:18-114:5). Even though Plaintiff believed Benscoter had the authority to implement the new procedures, Plaintiff testified she opposed the changes because she felt she might get into trouble for not following the old Third Shift procedures. (Pl. Tr., 106:14-16; 106:22-107:3; 116:7-10;161:5-6).

       14. When Plaintiff questioned Benscoter about the new procedures, Benscoter responded that she was the supervisor, and that the clerks needed to follow her instructions because that is how she likes things done. (Pl. Tr., 92:16-18; 113:5-9; 115:9-11).

       15. According to Plaintiff, Benscoter did not like being "corrected" by Plaintiff. (Pl. Tr., 114:17-23).

       16.  Concerning her working relationship with Plaintiff, Benscoter testified that "[w]hen I would assign her a task to do, she would sometimes not do it or choose to do it her way when I asked her to do it my way. (Benscoter Tr., 19:9-11).

       17. Plaintiff began complaining to Gibbs and McNellis in the Fall of 2011 that

Benscoter would not listen to her when she tried to talk to her regarding Third Shift procedures. As Plaintiff testified at her deposition, she notified either Gibbs or McNellis each time Benscoter changed what Plaintiff believed were proper Third Shift procedures. (Pl. Tr., 92:9-92:8;100:5-8;110:20-111:3;112:19-24;114:9-22).

18. After Plaintiff began complaining to Gibbs and McNellis about Benscoter changing procedures on the Third Shift, Plaintiff claims Benscoter started making snide comments towards her. (Pl. Tr. 130:10-12; 159:24-161:5). According to Plaintiff, Benscoter allegedly asked Plaintiff how old she was and when she was going to retire (Pl. Tr., 107:25-109:13; 125:17-21; 127:17-128:4); frequently critiqued Plaintiff's job performance and her inability to multi-task (Pl. Tr., 109:1-2; 110:4-7; 27:10-16; 122:8-19; 124:10-24; (Pl. Tr., 109:1-2; 110:4-7; 27:10-16; 122:8-19; 124:10-24; 127:10-16; 129:2-130:19); and asked Plaintiff whether she could perform her job faster, or told her to keep moving. (Pl. Tr., 111:17-21; 127:10-16; 128:5-23).

19. Plaintiff complained to Gibbs, McNellis and Carmichael about these comments. (Pl. Tr., 111:14-112:11; 131:2-132:24; 179:2-181:23).

20. At the same time Plaintiff was complaining about Benscoter to Gibbs and McNellis in the Fall of 2011, Benscoter was complaining to them about Plaintiff's insubordination. (Benscoter Cert., ¶¶9-10). Benscoter described the difficulties that she had with Plaintiff – in particular, Plaintiff's refusal to follow her instructions and Plaintiff's insistence on doing things her own way. (*Id.*)

21. In an effort to remediate the situation, McNellis counseled Benscoter on how to

handle such situations. (McNellis Tr., 15:25-18:2).

22. Additionally, Gibbs temporarily reassigned Plaintiff to cycle count (*i.e.*, inventory). As Plaintiff admitted during her deposition, Gibbs did not demote her, suspend her, reduce her pay or hours, or change her position. (Pl. Tr., 102:15-16). He simply assigned her to cycle count (which was part of her job responsibilities), instead of working inside the office with Benscoter. (Pl. Tr., 99:14-23). As Plaintiff admitted, it was "no big deal." (Pl. Tr., 100:22).

23. Plaintiff was unhappy with her temporary reassignment to cycle counting. Plaintiff felt Gibbs and McNellis should have met with both Plaintiff and Benscoter to work through their issues. (Pl. Tr., 103:11-25). On November 16, 2011, Plaintiff confronted Gibbs in his office and yelled at him about being removed from the office and placed on cycle count. (Rygiel-Boyd Cert., Ex. J; Pl. Tr., 99:24-101:5.)

24. In a written statement dated November 17, 2011, Carmichael memorialized a meeting that he Gibbs and McNellis had with Plaintiff to issue her a Written Warning for Unprofessional Behavior. (ECF 37-23). Carmichael wrote that "[Plaintiff] seemed not to accept the fact that her behavior was unacceptable, did not sign the write [sic] and constantly turned the conversation away from behavior to work performance, harassment, age discrimination and specific job replacement as punishment….After talking with her for quite some time the conversation with her was going no where [sic] and I told her it was her prerogative to go to HR and there was no reason for this conversation to take

7

place until then." (*Id.*) Plaintiff did not speak with HR. (*Id.*; Pl. Tr., 130:23-Brown Cert., ¶ 13).

25. In March 2012, Plaintiff received a 2.09% merit increase. (Rygiel-Boyd Cert., Ex. Z).

26. On April 6, 2012, Benscoter commended Plaintiff's job performance and recommended her for the employee recognition program. (Pl. Tr., 155:3-156:1; Rygiel-Boyd Cert., Ex. K). As a result, Plaintiff received a $50 gift certificate. (Pl. Tr., 1565:5-6).

27. As part of an investigation into complaints from Third Shift employees about Plaintiff, Anthony Brown ("Brown"), the Human Resource representative (age 41 at the time), and George Kleist, the Loss Prevention supervisor (age 52 at the time), interviewed all the Third Shift employees.

28. During her interview, Plaintiff revealed that she had previously tape recorded conversations with Benscoter while at work. (Uhlich Tr., 8:16-9:2; Brown Cert., ¶¶10-14; Kleist Cert., ¶¶ 4-5).

29. Plaintiff also prepared a written statement for the investigation, as all others were asked to do. In her statement, dated July 28, 2012, plaintiff wrote:

> When Cathy & I worked in Receiving office Cathy said I could not multitask & shouldn't have the job—At this time I was closing a hood, working a recheck talking to Norm on the phone. I just could not open another window at the time I was very upset, and went to Norm then Bill and said what was said. I believed it would be handled at this level— Instead I was taken off the job and put on counting for 3 weeks or until Cathy was out of receiving. I got written up because I complained loudly about getting pulled from my job. I then met with Donnie on dayshift & asked if I could go back to part time because she made me feel I couldn't do

> my job & I was afraid of losing it. I also said I wanted to talk to HR but Terry was on vacation. They said they would try to resolve this issue. I have still heard nothing. I continued to have controversy & it seemed like she (Cathy) was retaliating for me doing this. I also took a recorder in the room to record my answers for fear of being accused of insubordination by Cathy. Now with this present situation fear again for my job because Cathy was singing out loud in the breakroom this song. One Day I gonna get you.

(Rygiel-Boyd Cert., Ex. C).

30. Plaintiff made no complaints whatsoever about age discrimination during her interview or in her statement. (Uhlich Tr., 10:11-15; Brown Cert., ¶15; Rygiel-Boyd Cert., Ex. C).

31. Brown and Kleist averred that Benscoter denied giving plaintiff permission to tape record their conversations. (Brown Cert., ¶ 16; Kleist Cert., ¶ 6.)

32. Because Plaintiff admitted to secretly tape recording another employee without her permission, Brown terminated Plaintiff's employment effective August 28, 2012. (Uhlich Tr., 8:5-15; Brown Cert., ¶17).

33. Another employee, Denise Courtright ("Courtright"), overheard Plaintiff (while she was still employed) telling another employee in the bathroom that Plaintiff "was using a device while Cathy was around and recording her." (Courtright Tr., 10:15-23; 22:3-18).

34. Carmichael testified that Plaintiff admitted to him that she tape recorded a conversation with Benscoter. (Carmichael Tr., 9:17).

35. In her statement to the Equal Employment Opportunity Commission, Plaintiff denied that she ever admitted that she used a tape recorder, but only admitted that she had

9

carried a recorder into her meetings with Benscoter. According to Plaintiff, "As I have stated all along, I carried with the hope, that Ms. Benscoter would stop the negative comments and harassment if she knew it was on my person." (ECF 37-10, p. 26; ECF 37-11, p. 4.)

36. Brown had no knowledge of Plaintiff's prior complaint of age discrimination; nor did Uhlich or Kleist. (Uhlich Tr. 15:4-7; 16:21-25; 17:15-21; Brown Cert, ¶ 19; Kleist Cert., ¶ 7).

37. Benscoter had no involvement in the decision to terminate Plaintiff's employment; nor did Carmichael, McNellis and Gibbs. (Benscoter Tr., 8:16-18; Uhlich Tr., 17:22-18:2; Brown Cert., ¶18; Pl. Tr., 167:8-10).

38. Defendant selected Plaintiff's replacement solely on the basis of seniority. (Uhlich Tr., 29:19-25; McNellis Tr., 23:15-17).

39. When there is an open full-time position, it is the Company's consistent practice to offer the position to the most senior part-time employee. (Uhlich Tr., 29:19-32:4.) Wakefern has followed this practice since the Breinigsville, Pennsylvania facility opened in 2005. (Uhlich Tr., 31:2-8.)

## DISCUSSION

Both the ADEA and PHRA make it unlawful for an employer to retaliate against an employee for either "oppos[ing] any practice" made unlawful by their respective provisions or for "participating in any manner" in an investigation, proceeding, or hearing under their respective provisions. 29 U.S.C. § 623(d); 43 Pa. Cons. Stat. § 955(d). As a result, Plaintiff's PHRA claims "follow the analytical model developed by the United

States Supreme Court for Title VII cases." *Allegheny Hous. Rehab. Corp. v. Com., Pennsylvania Human Relations Comm'n*, 516 Pa. 124, 127–28, 532 A.2d 315, 317 (1987); see also *Bailey v. Storlazzi*, 729 A.2d 1206, 1214 n.9 (Pa. Super. Ct. 1999) (explaining that the elements of state and federal retaliation claims, brought pursuant to the PHRA and Title VII respectively, are identical). In addition, "[b]ecause the prohibition against age discrimination contained in the ADEA is similar in text, tone and purpose to the prohibition against discrimination contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under the ADEA." *Barber v. CSX Distribution Servs.*, 68 F. 3d 694, 698 (3d Cir. 1995).

In order to establish a prima facie case of Title VII retaliation, Plaintiff must show: "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001). "If the employee establishes his prima facie case, 'the familiar McDonnell Douglas approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.' " *Exantus v. Harbor Bar & Brasserie Rest.*, 386 Fed. App'x 352, 355 (3d Cir. 2010).

Defendant first argues that it is entitled to summary judgment because Plaintiff has failed to establish a prima facie case of retaliation. Specifically, Defendant contends that

there is no evidence from which a reasonable jury could conclude that Plaintiff engaged in a protected employee activity.

In her Amended Complaint, Plaintiff contended that she engaged in protected activity when she complained to Carmichael, Gibbs and DeNellis about age discrimination in November, 2011. However, in her response to defendant's motion for summary judgment, Plaintiff appears to have abandoned that claim and now claims that she engaged in two types of protected activity-the handwritten note of July 28, 2012 and carrying a tape recorder to record her conversations with Benscoter.

## **The Requirement of Protected Activity**

In *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn*, the Supreme Court outlined the two different types of protection afforded by Title VII's anti-retaliation provision.

> The Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The one is known as the "opposition clause," the other as the "participation clause," . . . The opposition clause makes it "unlawful ... for an employer to discriminate against any ... employe[e] ... because he has opposed any practice made ... unlawful ... by this subchapter." § 2000e–3(a). The term "oppose," being left undefined by the statute, carries its ordinary meaning, Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979): "to resist or antagonize ...; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1958).

12

555 U.S. 271, 274, 276 (2009). In further interpreting the opposition and participation clauses of Title VII, the Third Circuit has held that formal and informal complaints of discrimination or harassment constitute protected activities. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) ("[T]he complaints to [defendant], whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed Abramson's opposition to a protected activity under Title VII.") (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). The plaintiff must present evidence that "the opposition was to discrimination based on a protected category, such as age or race." *Daniels v. School Dist. of Phila.*, 776 F. 3d 181, 193 (3d Cir. 2015). See also *Slagle v. County of Clarion,* 435 F. 3d 262, 268 (3d. Cir. 2006) (holding that a complaint that does not explicitly or implicitly allege that membership in a protected class was the reason for mistreatment is too general to constitute protected conduct under Title VII).

In claiming that Plaintiff's July 28, 2012 written statement constitutes protected activity, Plaintiff seizes upon a single word in the statement, "retaliating," and contends that she has demonstrated that Defendant was retaliating against her for engaging in a protected activity. On the contrary, Plaintiff wrote that she believed that Benscoter was retaliating against her for "me doing this." (Rygiel-Boyd Cert., Ex. C.) Even a cursory reading of the statement reveals that "me doing this" did not refer to Plaintiff engaging in any protected activity, but rather referred to Plaintiff being pulled from her job and complaining about it and other forms of unfair treatment. (*Id*.)Nowhere in the statement does Plaintiff claim that the Defendant retaliated against her for engaging in a protected

13

activity such as complaining about age discrimination. As a result, the Court finds as a matter of law that the July 28, 2012 statement does not constitute protected activity.

Plaintiff also contends that her actions in carrying a tape recorder into her meetings with Benscoter to document and protect against harassment constitutes protected activity. In the first instance, there is substantial evidence in the record that Plaintiff did not merely carry a tape recorder into meetings with Benscoter, but actually recorded their conversations without Benscoter's permission. Plaintiff herself wrote in her July 28, 2012 statement that the purpose of carrying the recorder into her meeting with Benscoter was "*to record my answers* for fear of being accused of insubordination by Cathy." (Rygiel-Boyd Cert., Ex. C)(emphasis added.) Uhlich testified that Plaintiff mentioned to him and Brown that "[Plaintiff] had decided to tape record conversation between her and supervisor." (Uhlich Tr. 8-9.) Co-employee Courtright testified that she overheard Plaintiff (while Plaintiff was still employed) telling another employee in the bathroom that Plaintiff "was using a device while Cathy was around and recording her." (Courtright Tr., 10:15-23; 22:3-18). Supervisor Carmichael testified that Plaintiff admitted to him that she tape recorded a conversation with Benscoter. (Carmichael Tr., 9:17).
In addition, the notes from Plaintiff's August 2012 termination meeting document that Plaintiff admitted that she "recorded conversations in which all parties were not aware they were being recorded." (ECF 37-25, p. 2.)

The only evidence to the contrary is Plaintiff's self-serving *post hoc* statements to the EEOC that she never admitted to having used the recorder, but that she only brought

the recorder into the room so that Benscoter would see the recorder and stop the negative comments and harassment. (ECF 37-10, p. 26; ECF 37-11, p. 4.)

Under the Pennsylvania Wiretapping and Electronic Surveillance Control Act, it is a crime to intercept or record a telephone call or conversation unless all parties to the conversation consent. See 18 Pa. Cons. Stat. § 5703. *See* also *Commonwealth v.* Smith, 2016 WL 695606 at *7-*8 (Pa. Super. Feb. 19, 2016) (noting that an employee's surreptitious tape recording of a workplace conversation with his supervisor would violate 18 Pa. Cons. Stat. Ann. § 5703).

Moreover, an employee's opposition or conduct committed to combat alleged discrimination that violates the law or an employer's rules of workplace conduct is not protected activity. See *Argyropoulus v. City of Alton*, (Title VII does not "grant the aggrieved employee a license to engage in dubious self-help tactics or workplace espionage in order to gather evidence of discrimination."). *Jones v. St. Jude Medical S.C.*, (holding that employee's secret recordings of conversations with other employees, management or clients did not constitute protected activity under Title VII.) *Bodoy v. North Arundel Hospital* (an employee's secret recordings of conversations with his supervisors was a valid, non-discriminatory reason for his discharge.)

Even giving Plaintiff the benefit of the doubt as the Court must in reviewing a motion for summary judgment, carrying a recording device into her meetings with Benscoter would not be protected in this case because Plaintiff herself wrote in her July 28, 2012 statement that the purpose of carrying the recorder into her meeting with Benscoter was "to record my answers *for fear of being accused of insubordination by*

15

*Cathy.*" (emphasis added.) Plaintiff did not state that the purpose was to document unlawful discrimination or any other protected activity. If Plaintiff recorded anyone's voice without their consent, she would have essentially committed a crime. Surely, this type of behavior cannot be tolerated by an employer.

 Because there is no evidence from which a reasonable jury could conclude that Plaintiff engaged in a protected activity, Plaintiff has failed to establish a prima facie case of retaliation. In addition, Defendant has demonstrated a legitimate reason for terminating Plaintiff, which Plaintiff has not shown to be pretextual in any way. Accordingly, judgment is entered in favor of Defendant and against Plaintiff.